Alright, if Council are ready, let's move next to 25-4124, Utah Political Watch v. Musselman. Mr. Miller, you may introduce yourself and proceed. Yes, thank you, Your Honor. I'm Charles Miller with the Institute for Free Speech. I'm here today on behalf of Brian Schott and Utah Political Watch. I'd like to reserve about four minutes for rebuttal, so we'll see how it goes. Alright. Speech restrictions based upon the identity of the speaker are all too often simply a means of controlling content. That's from Citizens United. And in addition to that, in Reed v. Town of Gilbert, the Supreme Court made clear that distinctions based upon the function of the speech or the purpose of the speech are also subject to strict scrutiny because they really are also designed to go to content. And then I just want to note something else here from the Supreme Court before we sort of discuss the facts here a little bit. Today is St. Patrick's Day. I've got to mention Hurley v. Irish Americans. Alright, so we quoted them in the brief as well for the purpose that the state cannot intrude upon the exercise of editorial content or judgment. Now, in my brief, I made the mistake of when editing, had an id there instead of the citation. But that was the case we were citing 515 U.S. 557 and 570. Why isn't this a content neutral policy? Yeah, so on its face, it's not content neutral because it excludes independent. That's right. Yeah. And so what we're doing is we're taking media, you know, so you have a policy that creates a limited public forum or nonpublic forum, what have you. It's pretty much the same in this instance for journalists. And then it's creating this this artificial distinction that they began in 2025 to say, but not independent journalists or bloggers. And it's a distinction that makes no sense. And they have no reason for it. I asked them, you know, where you have space constraints. Is there a reason for this? And they said no. They said the reason that's in the record, they say they don't have any space constraints. Yes, that is. That's right. That's right. That's in the right. You have it in your brief. I have it in the brief, but I just want to make a slight distinction. I'm going to distinguish between attorney arguments and between the what between attorney arguments and what what their clients said. So when I cite the depositions to say that they cite the sort of argument that they make or a declaration. I think I think what about there's favorable parking concessions. Surely that's a space issue. Sure. There are six parking spots. Nobody cares about that. You know, if you don't get a parking spot, you just don't get a parking spot. Their first come first serve. I thought they had they had journalists reserved for the special people, but not for. Yeah, sure. Yeah, they do. I mean, we wouldn't be here talking about parking. Parking's immaterial. That's just a bonus thing. You know, they've got six parking spots. They have 140 people with passes. I'm guessing not under all 140 of them squeeze in there. And actually, you know, they talk about 140 pass holders. It's 20 institutions. This is the entire state of Utah. They have 20 institutions right now that have credentials. And we would be 21. And by institutions, you mean traditional paper, newspapers and television and radio? And blog. And a blog. There's a blog. A blog has been recognized. Yes, there was a blog that was called Building Salt Lake. It is self-identified as a blog, and it's actually not even a state policy blog. It's a blog for urban development. But I'm looking at the policy and it says blogs do not qualify as for a credential. Yeah, I find that interesting. Yeah. OK, so you're saying they did credential a blog contrary to the policy. That's right. And have they credentialed an independent media yet? They credentialed Utah Policy, which UtahPolicy.com, it's out there. It's basically a news aggregator, and it runs some pieces that seem to be opinion pieces. But I assume that would qualify under their interpretation as an independent media. I think that would be independent. And also, it only has one employee who is its editor, and she's the person. Is this in the record? Yes, it's in the record. All right, and Utah Political Watch is one person with a website and a blog. Yes, that's correct. And another employee. He has a person who is his wife who serves as an editorial process, a copy editor, not a control editor, a copy editor. So she does that for him, and he does long-form journalism. He does the same work that he's been doing throughout his entire career. He breaks lots of stories. He interviews U.S. senators and everything else. You mean he's doing the same thing he did when he worked for the Tribune? Yes. All right, except he doesn't have a publisher. He doesn't have that institution behind him. He's out there on his own. He does his 4,000 to 10,000 views per article that he puts out there, but he's doing it all on his own. Is he an LLC? Is he a corporation? He's an Inc. He went C-Corp. I don't know why, but he did. Is that Citizens United then? Yes, sure. So it's a corporation out there that's doing this. But his message is all digital. It's not print. Yes, that's correct. I think lots of things are that way. I'm going to ask him a question. No, that's fine. It's digital. Well, also, he's got the video, but I guess that's digital too, right? Yeah, so he does that. And also, I really want to emphasize about the policy. So the reason it's not content neutral is because it's directed at the type of speaker? Is that the problem here, i.e., blogs and independent media? Yes. And how is that viewpoint discrimination under the cases? Yeah, so under the cases, the cases talk about how viewpoint is not limited to political viewpoint. And it really should be viewed in a very broad way. So basically, the choice of how to repost or edit is something that is viewpoint. And specifically, I think that the Blatty case talks about this from the Supreme Court, talks about that things should be judged based upon their speechworthiness and not the message. If you look at the Lakewood case, they were regulating the location of newspaper racks, and that was determined to be too much discretion that they had. And so that's part of the argument here with respect to this content because they have this where they have independent media, some get in, some don't, one employee, some get in, some don't. We're really saying that there's a lot of discretion that's there. And the problem with that discretion is when you get that much discretion, it creates the ability for there to be prior restraint. For there to be what? Prior restraint, the idea that we don't like this, so we're going to not credential them. I thought you would have said it awakens the Tiger viewpoint more so than prior restraint. Well, that's my point. It allows, it affords them the option then. They've got the leverage there to say that what they're doing is based upon the policy, but they're really doing viewpoint discrimination. And is that furthered? Now, you don't have an equal protection claim. I do not have an equal protection claim. Well, you're claiming discrimination, but it's not as an equal protection claim. No, because the analysis is pretty much the same under equal protection. So the fact that they allow a blog when they say they're not going to, but they don't allow your blog, stuff like that reflects upon, you say, prior restraint and maybe viewpoint. It's definitely viewpoint. Right. Yeah. So, I mean, what it's showing is it's showing that they're not following the policy that's going on. Because they're not following the policy, it is creating a viewpoint or content-based restriction that should be viewed for strict scrutiny. Do we need to know, as an evidentiary matter, how your client's viewpoint differs from one of the privileged journalists or even the blog that's privileged? I don't think— Do I have to know what their message is? I don't think you need to know it because he's been excluded, but I sure provided it for color. Is there anything in the record that indicates that your client has a particular viewpoint? I mean, I know he was critical of some staffers. Well, not just the staffers. Right before he applied for this—five days before he applied for this pass for 2025, he published a story indicating that the—I think it was the Speaker of the House or the President of the Senate—was engaged in unethical behavior as alleged by another entity that filed a complaint. And he got lit up on X about that. He got called a former journalist by the Speaker—I'm sorry, by the President. And so we see that they have lots of animosity against him. And to add to it, the defendants, in their brief they filed here, they said, well, you know, those are not the only ones. And they showed you some X posts from others, you know, insulting my guy, too. And they're saying, well, look, we didn't take away his credentials back then, you know, earlier in the year when he was still with the Tribune. But it certainly shows the animosity. And again, for the policy from 2019 through 2024, they allowed bloggers and independent media to be there. They only changed the policy once my guy left, and he was the only one that's been excluded from this. And they said there's no space constraints. They admitted in deposition after a very long pause that he's a professional journalist, you know, that he's doing the work covering there. So he meets all the substantive requirements. Does he make money from his site? Yeah, absolutely.  Yeah, he's got subscribers, and then he gets the ad share as well from the podcasts and the like. And then again, you know, he makes enough money that, you know, he makes his living off of this. And then he's got an insurance policy, you know, so he can be sued for libel. He's got $2 million worth of coverage. You know, he's as professional as he gets with this as anybody else. Did I understand what I thought you said that when the policy was initiated in 2019? Yeah, 2019. That he was the only one excluded? Well, so in... So there were a bunch of applicants, right? Yeah, so in 2025, he was the only person excluded. You mean there was a gaggle of applicants, and all the applicants were authorized, and he was the only applicant that wasn't? That's exactly right. What I didn't understand about your argument before or now is, was he the only blogger that was denied? In other words, I understand that if he was the only blogger that applied, he was also the only blogger that was automatically disqualified under the policy. Building Salt Lake was a blog. Other than Building Salt Lake. Well, yeah, other than that, yeah. But there was another publication that was simply one person, or there were two other publications that were one person that were permitted. Because what they're saying is you need to have an editor, you need to have somebody over you. But there are two other publications that were like that. So I've got two minutes left, so I'll save the rest for... Okay, thank you. May it please the court. Daniel Vitaliano for defendants, appellees, the Utah legislative officials. I want to first make very clear, we're here on appeal from a 12B6 dismissal, and the court then subsequently denied the preliminary injunction motion as moot. There's been a lot of talk about evidence in the record. So first, it's a 12B6, so we're limited to the allegations in the complaint, documents attached to the complaint. Let me ask you this. Are the things that Mr. Miller said are in the record that are in the complaint, as to him being the only person excluded in 2025, that one blogger is in and he's out? Sure, I can walk you through the allegations in the complaint, followed by the record. Did he allege that in the complaint, either of those things? At Exhibit 12 to the complaint is a list of all the entities that were credentialed for the 2025 session, as well as other entities that were not credentialed, and their credentials were denied. He was not the only applicant that was denied for 2025. There were three others, all for the same reason, that they are self-edited. As to the question of being a blog, at paragraph 69 in the amended complaint, they allege that Building Salt Lake is a blog, and that cites to Building Salt Lake's website. If you follow that URL, which is incorporated into the complaint, it makes no mention of Building Salt Lake being a blog. So to the extent that allegation in the complaint contradicts the document that is incorporated in the complaint, the document would control it. So in other words, if you have an allegation that you would credit, and it incorporates a website that is agnostic on the issue, then we should assume, notwithstanding our liberality under 12b-6, that because the website was agnostic, that the allegation in paragraph 69 couldn't possibly be true. Correct. It's just an inaccuracy. No sense to me. It's an inaccurate quotation that they're quoting the website, and if you go to the website, it's not quoted as being a blog. It doesn't say it's a blog. Does it say it's not a blog? It doesn't say it's not a blog, but it says nothing about being a blog. But there's an allegation in the text of the complaint that it is a blog. Sure, and they allege that it is a blog, but just alleging that it's a blog is conclusory. You just corrected me in saying we're not on summary judgment, we're on 12b-6. We're talking about allegations of the complaint. Yes, but the cited document, the URL website, is incorporated into the complaint. But the cited document, you say, does not negate the allegation. It just doesn't necessarily support it. They're quoting language that it says it's a blog. That quote does not appear anywhere on the website. Okay. That's our point on that. And there is specific evidence in the record, Appendix Volume 2, Pages 20-24, Declaration of Andrea Peterson, that walks through these entities and explains the basis for credentialing entities like Building Salt Lake or other entities that were identified. And that should be incorporated into the complaint for 12b-6? No, that's in the preliminary injunction record. Which was only denied based on mootness, right? Correct, yes. So on 12b-6, what you just referred to should be out of our minds? That point about those entities, correct, yes. Okay. But I'd like to state one more. Wait a minute, wait a minute, wait a minute. The attachment to the complaint, you said, that lists the ins and the outs, does it identify them whether they're blogs or not blogs? It says that they're self-edited, and that's one of the criteria determining whether they qualify as an established reputable news organization under the policy. My question is, do they say blog? It does not say blog or not blog. But I want to take one step back. It's undisputed that the forum analysis applies to this case, and under that three-step framework, questions about viewpoint discrimination or anything of the sort only come at step three, and that doesn't get reached until plaintiffs satisfy their burden at step one to establish that there is a burden on their First Amendment activity. Well, are you talking about Smith v. Plotty? Smith v. Plotty, also the Supreme Court's decisions in Pell, Saxby, and Hutchins. Well, as I understand it, and you tell me if I'm wrong, your argument about prong one, whether or not it impeded Mr. Schott, his ability to newsgather is great, that's just not what his claim is. His claim, much like the other discussion we had in the prior case, is that once there is a forum that is provided under the media credentialing policy, that it cannot be viewpoint discriminatory. Sure, but under Cornelius, the Supreme Court's decisions, decisions of this court, Hawkins, that set forth the forum analysis, at step one, the plaintiff has the initial burden to allege an infringement on their activity. Where does it say infringement? It says that the activity has to be protected. Sure. And that's why in Smith v. Plotty, where the court was dealing with a prohibition against the journalist being able to gather news made sense at prong one, because that was an infringement of a protected activity. His argument is not that his ability to newsgather was being infringed upon, but once there was a protected activity and a forum that was provided by the state for him to exercise that protected activity, it couldn't be viewpoint discriminatory. Sure. His count one of the complaint is pleaded in terms of his First Amendment right to newsgather. And whether that activity is protected is defined by the Supreme Court in cases like Pell, and it explains that the First Amendment newsgathering right guarantees only access to sources of information that are available to members of the public generally. As we set forth in our brief on pages 18 to 20, we explain all the specific information that the plaintiffs are seeking, and all of that is available to members of the public generally. So the activity that he's seeking to gather that specific information, that's not protected by First Amendment. And that's fine, and I think you'll get up in rebuttal and say that's fine, because he never mentions that theory in his briefing. The district court explained they don't respond to it, they never responded to it. Right, and I don't think that we're being asked to deal with that hypothetical claim that he may have presented in district court. As I understand it, his claim is that if it was viewpoint discriminatory, in other words, if he was denied immediate credential because of antagonism for his past reporting, then that is a violation of the First Amendment. For Counts 1 and 2, yes, Count 3 is a retaliation claim. So Counts 1 and 2 under the forum analysis, because they concede it is a limited public forum that amended Complaint Paragraph 109, page 31 of their brief. So then the standard is reasonableness and viewpoint neutrality. There was some discussion before about whether it's content-based or not. This Court's decisions in Brown, we cite, explain, and Supreme Court decisions that when you're operating in that type of forum, distinctions can be based on content, and that's inescapable. But they can't be based on viewpoint. Not viewpoint, it's viewpoint and reasonableness. All right, that's why I want to get to Paragraph 116 of the complaint. Additionally, Schott was considered a professional journalist by defendants since he started receiving credentials over a decade ago. It was only after he angered defendants with his reporting and started his own publication that defendants suddenly determined Schott was unprofessional. This shows plaintiffs are being punished based on the viewpoints expressed in Schott and in UPW's reporting. Since we're here on 12B6, and we're here not on the unqualified ability that news gather, but based on viewpoint discrimination, why doesn't Paragraph 116 suffice at 12B6 to show viewpoint discrimination? Sure, I would point you to Exhibit 10 of the amended complaint, which was the letter denying his appeal from the denial of his application. And it explains that he was previously credentialed when he was working at the Salt Lake Tribune, which has always qualified as an established reputable news organization. He was fired from the Salt Lake Tribune in the fall of 2024, and this is set forth in that letter explaining that then he started his own organization, Utah Political Watch, and that does not qualify under the policy as an established reputable news organization. The policy turns more on the organization, not the individual journalist. According to you, according to him on Paragraph 116, and according to his allegation that there was another blog that also would have been disqualified under your media credentialing policy and was allowed a media credential, why doesn't that at least get you past 12B6? Because the initial allegation is squarely contradicted by Exhibit 10 to the complaint, explaining that his departure from the Tribune was the reason why he was no longer eligible and that his new entity did not qualify. And when an exhibit, a document is attached to the complaint, that trumps any contradictory allegations. That's well settled. Why is Utah Political Watch a disreputable news organization? I wouldn't say it's – part of it is being established and reputable and the criteria that are considered, and they cite a declaration that was submitted below in the complaint, explains the considerations that legislative officials consider, and that's whether a journalist is subject to editorial oversight, whether there's institutional framework at the entity. And Utah Political Watch is a self-edited, self-run, one-man operation. Mr. Schott is not responsible to anybody but himself. Nobody edits his work. He alleges that he has Ms. Morel as an editor, but he did not disclose that on his application. But his work is absolutely no different than when he was at the Tribune. You say – He's at a different organization. The fact that he doesn't have an editor makes his news organization ineligible for this credential, and credentials may be denied or revoked for any reason. I think that is a bit of a red flag here. But does not represent an established reputable news organization or publication. That seems completely standardless and vague. I would not call that standardness or vague. It's very similar to the policies that the Seventh Circuit upheld in the Evers case as reasonable and viewpoint neutral, that the criterion there was whether you're a bona fide correspondent of repute in the profession. It's no different than the D.C. Circuit policy. Which he is. Those policies – His professional career is – Those policies turn more on the individual journalist, whereas this one turns on the entity. But I would say the White House credentialing policy employs that same language, and it has always been understood – And it was struck down. I'm sorry? The White House policy was struck down. When it tried to exclude a journalist. In the AP case, that's separate. Which is the denial of a hard pass. And that employed that same criterion, whether you're a bona fide correspondent of repute in your profession. And that has always been understood to exclude independent journalist bloggers. That's why we explain in our briefing when the White House said it was going to open up the briefing room to independent bloggers, it received 7,400 applications within 24 hours. Those individuals of social media influencers, citizen journalists, they were never eligible under the White House's policy. That was upheld in ADIPA. And more specifically, I would say to the allegations of viewpoint discrimination, I would again point you to the Evers case in the Seventh Circuit. Attached to the complaint that exhibits 12 and 13. It gives a list of all the qualifying entities that have been given credentials. And it shows their journalists and organizations of diverse viewpoints from the Salt Lake Tribune, which is generally regarded as left-leaning, to Deseret News, which is generally regarded as right-leaning. And the Seventh Circuit in Evers says that that refutes any suggestion that credentials are being distributed based on viewpoint when you have a diverse collection of entities with varying viewpoints. Wait a minute. What is it that shows in the filings we can recognize that there's diversity of viewpoints in the crowd that's allowed in? Attached to the complaint is a list of all these entities. Does it say lefty, righty on the attachment? It does not there, no. But in the preliminary injunction record, it further explains it. But this court can... We're still at 12 v. 6. Sure. Even if the court were to not want to make any assumptions about organizations like that, Exhibit 12 includes all the other entities that were denied. And it gives the reason for it, that they are self-edited. And that explains that the decision to deny Mr. Schott's credential was consistent with other decisions. Well, there's also an as-applied challenge. And he makes allegations of animus or retaliation against him for speech that he's engaged in. I mean, what do we do about that? I mean, doesn't that at least raise an inference that he was denied a credential because of speech that he made that the government, your clients found offensive? Sure. So there's two separate inquiries there. First is their counts one and two, first amendment claim. Then there's the count three, which is the retaliation claim. I'll start with the retaliation claim. The district court applied this court's decisions in Smithy, Plotty, and Schiro v. City of Grove. My friend on the other side, they do not cite that in their brief where the two paragraphs, they address the retaliation claim on pages 38 and 39. They simply don't address those. And those explain that not receiving a credential would be, it's a de minimis injury. It's not recognizable. It wouldn't shill a person of ordinary firmness. And in Smithy, Plotty, the court looked up whether alternative avenues of information were available. And as we explain, all of that's still available. It also looked to whether the decision in any way prevented the individual from speaking out or maintaining a website. Mr. Schott has continued to maintain his website even without a credential. So that's on the retaliation claim on the claim subject to the forum analysis. Mr. Schott merely alleges just temporal proximity in this court's decisions in Tramp. And Vidaire explained that that's not enough, I would say. And it's also the fact that Mr. Schott received a credential every year until he left the Tribune. And even while he was at the Tribune, was, you know, publishing content that would arguably be critical of the legislature, he continued to receive a credential year over year. Right, but here you have statements by the credentialing authority that he's been unethical and, you know, he's no damn good any longer since he left the Tribune. I mean, isn't that raised a plausible inference of? I would say no. So that incident that you're referring to in the text exchange with Ms. Peterson, that, as the district court explained in the transcript denying a TRO, that co-stated the revision of the policy, which occurred in November. That was in mid-December. So that could have no bearing on whether Mr. Schott then qualified under the criteria. He complains about the revision to fully exclude blogs and independent media. And the evolution of the policy over time shows that nothing was done here to target Mr. Schott. In 2021 and 2022, there was a loophole where bloggers or independent journalists could be qualified under some circumstances. In 23 and 2024, it was then narrowed to rare, limited rare circumstances. And then it was then changed to close that loophole and not allow for it at all. And the reasons given for it is because there has been a large uptick in inquiries. And this is it was explained in a declaration, but Mr. Schott cites this in the complaint. It's at paragraph 36 of the amended complaint. It explains that the reason for this revision is because the legislative officials have been receiving increased inquiries from bloggers, independent media, social media, journalists. And they wanted to eliminate any sort of discretion and make a fine black and white line of who qualified and who did not. I think your time's expired. Mr. Miller, you have some rebuttal time. Thank you. Thank you. Thank you, Your Honor. Just to clean up some of this factual stuff first. On page 15 of the brief, we cite to the parts of the deposition transcripts where they admit that there were no space constraints. We also made an allegation in the complaint. On page 17 of the brief, we have the long quotes from Mr. Schott explaining how he's injured by being excluded. It's not de minimis. With respect to Building Salt Lake, in paragraph 69 of the complaint, we state that the Building Salt Lake website described itself as locally owned independent media and touts that Building Salt Lake is a nationally recognized top 100 urban planning blog on the about page. It's probably been changed since then, but that's what it said at the time. So those are allegations that were there in the complaint. With respect to the other people being excluded in 2025, the list that is on the complaint on page 92 of the appendix, that's a list that is from all five years, and they intentionally did not put dates on there. We asked them about it in the deposition, and on the deposition, it was asked if anyone other than Schott was excluded in 2025, and on appendix volume 4, page 28, they state that they do not remember anyone else being excluded in 2025, but they did ask more questions of Building Salt Lake. How do we deal with that when we're on 12B6? Well, with respect to 12B6, just look at the complaint, because we allege all these things in the complaint and the attached declaration. So it's all there for those purposes. I'm just clarifying that we were very careful about doing that. With respect to the argument that was being made that Mr. Schott can just go and get his sources elsewhere, copy off other media, or he can listen to the audio transcript, which, as you know from these things, are not always that good. With respect to that, going to other sources, in those opinions, they say unless there was content discrimination or viewpoint discrimination. When that occurs, there's no substitute that's okay. Any even diminished injury is the first injury that deserves to be rectified. We've requested that the court also order that there be an injunction put on. This is two years now that Mr. Schott has missed the general session. There are special sessions that are going to come up. We've established more than enough here to indicate that he was the only one that was excluded because of his viewpoint. And their statement that you just need to have a supervisor, someone who can fire you, just doesn't make sense. That doesn't even hold up as a rational basis for a policy. You can only have First Amendment rights if we can go and jawbone your supervisor and they can discipline you. There's no government. Is the General Assembly done for the year? Are they still in session? They just completed their normal session. Has there been any announced special session yet? My understanding is that there have been indications that there will be special sessions, but there's not been a timing of those that have been announced yet. In effect, your request for injunction has really been mooted by the denial of the stay and the passage of time. If there's another legislative session, I guess you can reapply. No, Your Honor, because what we're requesting is that they be enjoined from denying Mr. Schott the credentials for these reasons. It's not letting him in. It's giving him the credentials. And a lot of times these special sessions are announced on very short order. And there's no reason to make us come back in emergency posture for this. You know, we've tried this and it just takes too long. When a session is announced and they have it a couple of days and then it's just gone. These are very ephemeral. I think we understand your argument and your time is expired. There was something I picked up on that at the governor's news conferences that the executive branch adopts the same list or whatsoever. Is that in the complaint or in a deposition or something else? I think that we have that in the complaint as well. We allege it there. So I think the governor's news conferences happen there and they rely upon the legislative process. My question is, is there anything in the complaint about that? Yes. Okay. Thank you. Right. Thank you, Counselor. You're excused. The case shall be submitted. And the court is in recess until tomorrow morning at 9 o'clock.